# United States District Court
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| DAVID CRUSON and JOHN DENMAN | § § § |
| v. | § Civil Action No. 4:16-CV-00912 § Judge Mazzant |
| JACKSON NATIONAL LIFE INSURANCE COMPANY | § § § § |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Jackson National Life Insurance Company's Motion for Summary Judgment (Dkt. #59). Having considered the relevant pleadings and evidence, the Court finds the motion should be granted in part and denied in part.

## BACKGROUND

Plaintiffs David Cruson and John Denman ("Named Plaintiffs" or "Plaintiffs") bring this proposed nationwide class action on behalf of themselves and others who purchased variable annuity contracts (the "contract(s)") from Defendant Jackson National Life Insurance Company ("Jackson"). In so doing, Plaintiffs aim to wrest and remedy harm resulting from Jackson's systemic contractual misrepresentation and breach when assessing certain fees—surrender charges—on those products.

Jackson nationally markets variable annuities through a network of individual sales agents, marketing organizations, third-party marketing organizations, brokerage firms, and financial institutions. Jackson sells variable annuities through four distribution channels—independent broker/dealers, regional broker/dealers, financial institutions, and individual sales agents ("affiliated agents"). To support its affiliated agents, Jackson prepares, approves, and disseminates account service forms, brochures, marketing, and sales materials. Affiliated agents use these

materials to market and sell annuities to customers, many of whom are senior citizens. Jackson primarily markets variable annuities to older customers and senior citizens in the Eastern District of Texas and nationwide. When marketing its annuities, Jackson touts their guaranteed safety of principal, lifetime income streams, and opportunities for market growth.

A deferred annuity can either be fixed or variable. Fixed annuities appreciate at a guaranteed fixed interest rate. The issuer of a fixed annuity pays the purchaser a guaranteed interest rate—similar to a debt instrument. Variable annuities, on the other hand, invest in equity portfolios and do not appreciate at a guaranteed fixed rate. As equity markets shift in value, so does the return on the annuity.

Fees significantly shape variable annuity performance. One fee—the surrender charge—generates substantial revenue for issuers like Jackson. Such surrender charges include withdrawal charges and recapture charges (collectively, "surrender charge(s)"). From 2009–2013, Jackson published the following surrender charges—2009: $25,432,934; 2010: $31,960,116; 2011: $37,748,144; 2012: $40,792,400; 2013: $52,189,880 (Dkt. #10 at pp. 11–12). In 2014, Jackson stopped publicly reporting surrender charges. Given this burgeoning trend of annual surrender charges, however, Plaintiffs presume that Jackson earned over $50 million in surrender charges in 2014 and 2015.

Plaintiffs claim that Jackson assesses surrender charges on withdrawals from annuities and again on the surrender charges themselves. In doing so, Plaintiffs aver that Jackson breaches the plain language of its contract and contravenes Securities and Exchange Commission annuity consumer protection guidelines. Plaintiffs aim to stop this practice and compensate current and former contract holders who paid excess surrender charges.

On January 19, 2018, Jackson filed its motion for summary judgment (Dkt #59). On February 15, 2018, Plaintiffs filed a response (Dkt. #70). On February 22, 2018, Jackson filed a reply (Dkt. #77). On February 28, 2018, Plaintiffs filed a sur-reply (Dkt. #79). On June 5, 2018, the Court held a hearing on Jackson's motion for summary judgment (Dkt. #108).

**LEGAL STANDARD**

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is proper under Rule 56(a) of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Substantive law identifies which facts are material. *Id.* The trial court "must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment." *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).

The party seeking summary judgment bears the initial burden of informing the court of its motion and identifying "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" that demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323. If the movant bears the burden of proof on a claim or defense for which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Where the nonmovant bears the burden of proof, the movant may discharge the burden by showing that there is an absence

of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). A nonmovant must present affirmative evidence to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. Mere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden. Rather, the Court requires "significant probative evidence" from the nonmovant to dismiss a request for summary judgment. *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (quoting *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 114 (5th Cir. 1978)). The Court must consider all of the evidence but "refrain from making any credibility determinations or weighing the evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

**ANALYSIS**

As a preliminary matter, Plaintiffs concede that the economic loss rule likely forecloses their ability to recover damages for their breach of fiduciary duty claim because "the damages [they seek] to recover for the class are the same damages [they seek] for breach of contract" (Dkt. #70 at p. 29). The Court agrees and summary judgment is granted as to Plaintiffs' breach of fiduciary duty claim. The Court now turns to whether Plaintiffs have a viable breach of contract claim.

**I.      Breach of Contract**

The Court, sitting in diversity, applies Texas law in the interpretation of contracts. *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 150 F.3d 526, 529 (5th Cir. 1998).

4

Under Texas law, "[t]he elements of a breach of contract claim are: (1) the existence of a valid contract between plaintiff and defendant; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of the contract; and (4) the plaintiff's damage as a result of the breach." *In re Staley,* 320 S.W.3d 490, 499 (Tex. App.—Dallas 2010, no pet.).

The only contested element is whether Jackson is in breach of its contracts. The parties apparently agree that the contract is unambiguous, however, their respective interpretations of the agreement are different as to the application of the surrender charges.

Plaintiffs assert that Jackson breached and continues to breach the annuity policies in two ways: (1) applying the surrender charge to the Remaining Premium withdrawn, instead of only deducting the surrender charge from the remaining Contract Value, and (2) Jackson's calculation of the surrender charge is unsupported by the contract language because it includes a calculation of a gross amount for the withdrawal as an initial step, which results in "withdrawal charges on top of withdrawal charges" (Dkt. #70 at pp. 10–17).

Jackson asserts that Plaintiffs' breach of contract claim fails as a matter of law because it properly calculates the surrender charges pursuant to the "unambiguous language of the contracts" (Dkt. #59 at pp. 10–11). Jackson argues that the prospectuses for the annuity contracts, which are alleged to be incorporated into the contracts by reference, "reinforce this methodology with specific examples and mathematical formulas." (Dkt. #59 at p. 11).

**A. The Prospectus, Including Exhibit B, is Not Part of the Entire Contract**

Jackson asserts that "the prospectuses for the Jackson products at issue (*i.e.,* Perspective II and Perspective Rewards) include an 'Exhibit B,' which provides an explanation and illustration of how surrender charges are calculated." (Dkt. #59 at p. 7). Jackson asserts it calculates surrender

charges based on the gross remaining premium withdrawn, which includes the surrender charge, and supports this interpretation with examples illustrated in the prospectus.

As support that it is using the correct calculation and application of surrender charges, Jackson argues that the contracts are partially-integrated, not fully integrated. Accordingly, Jackson argues that the prospectuses should be considered as part of the contracts (Dkt. #59 at p. 18). Plaintiffs assert that the contracts are fully integrated and do not include the prospectuses as part of the contracts (Dkt. #70 at p. 20).

As this Court is sitting in diversity jurisdiction, the Court applies the parol evidence rule of Texas. *Harville Rose Serv. v. Kellogg Co.*, 448 F.2d 1346, 1349 (5th Cir. 1971). Under that rule, evidence offered contrary to the apparent terms of an integrated contract[1] is admissible only if the contract is incomplete or ambiguous. *Jack H. Brown & Co. v. Toys "R" Us, Inc.*, 906 F.2d 169, 173 (5th Cir. 1990) (applying Texas law).

Under both Federal and Texas law, the Court may look to parol evidence to determine whether an invoice is a complete expression of the terms agreed upon between the parties, and thus, partially or fully integrated. *Pennzoil Co. v. F.E.R.C.,* 645 F.2d 360, 388 (5th Cir.1981) ("It is only after consideration of the extrinsic evidence that the parol evidence rule applies if in light of the circumstances and purposes of the contract the court finds it unambiguous and integrated . . . ."); 49 TEX. PRACTICE: Contract Law § 8.3 (2017) ("Until the contract is deemed either unintegrated, partially integrated, or fully integrated, the parol evidence rule does not bar any evidence.") (citing *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981); *Tribble & Stephens Co. v. RGM Constructors, L.P.*, 154 S.W.3d 639, 651 (Tex. App.—Houston

---

[1] Contracts are presumed integrated. *N. K. Parrish, Inc. v. Sw. Beef Indus. Corp.*, 638 F.2d 1366, 1368–69 (5th Cir. 1981) (applying Texas law).

6

[14th Dist.] 2004), *opinion supplemented on overruling of reh'g,* (2 pets.) (Feb. 10, 2005)). Each policy includes the following provision or a slight variation:

> **ENTIRE CONTRACT**. The Contract, and any attached Company forms, endorsements, and amendments together make up the entire Contract.

(Dkt. #72, Exhibit P at p. 9 (VA630); Exhibit I at p. 9 (VA210 same); Exhibit. J at p. 9 (VA220 same); Exhibit K at p. 9 (VA250 same); Exhibit L at p. 9 (VA610 same); Exhibit N at p. 9 (VA340 same); Exhibit O at p. 9 (VA620 same); Exhibit Q at p. 9 (VA640 same)). Instead of stating "attached Company forms," the two variations recite "application," suggesting the application is the "attached Company form." (Dkt. #72, Exhibit H at p. 6 (VA200 "Entire Contract. The policy is a Contract. The Contract, Contract Data Page, application, if any, and any applicable endorsements make up the entire Contract."); Exhibit M at p. 4 (VA600 "Entire Contract. The Contract, application, if any, and any applicable riders, endorsements and amendments together make up the entire Contract.")).

Furthermore, Jackson has previously argued and prevailed in arguing that a similar "Entire Contract" provision in one of its contracts meant the contract was fully integrated and foreclosed extrinsic evidence. *See In re Jackson Nat. Life Ins. Co. Premium Litig.*, 107 F. Supp. 2d 841, 849 (W.D. Mich. 2000). In that case, the provision read

> **CONSIDERATION: ENTIRE CONTRACT**. The consideration for issuing this Policy is the application and the payment of the first premium. This Policy and the application, a copy of which is attached and made a part of this policy, constitute the entire contract between the parties. . . .

*Id*. That provision in the Michigan case also further suggests that "attached Company forms" in the contract in this case is the "application." Lastly, the prospectus in this case states:

> This prospectus provides a description of the material rights and obligations under the Contract. **Your Contract and any endorsements are the formal contractual agreement between you and the Company.** It is important that you read the Contract and endorsement, which reflect state or other variations.

7

(Dkt. #72, Exhibit G, JACKSON_00011129) (emphasis added). That is a clear indication that the prospectus was not intended to be a part of the contract. *See Miller v. Nationwide Life Ins. Co.*, 448 F. App'x 423, 432 (5th Cir. 2011) ("[T]he prospectus does not form part of the contract[.]"); *Prusky v. Prudential Ins. Co. of Am.*, No. CIV.A. 00-2783, 2001 WL 34355665, at *6–*7 (E.D. Pa. Oct. 30, 2001) (confirming that a prospectus was not part of a contract based on language in a prospectus similar to the contract's Entire Contract provision).

The Contract also includes a modification provision, which states

> **MODIFICATION OF CONTRACT**. Any change or waiver of the provisions of this Contract must be in writing and signed by the President, a Vice President, the Secretary or Assistant Secretary of the Company. No financial representative or producer has authority to change or waive any provision of this Contract. The Company may amend or waive any portion of this Contract without notice or consent if state or federal law permits or so requires.

(Ex. P at p. 9 (VA630)). Thus, a representative's or producer's statements or explanations to customers regarding the calculation of surrender charges cannot change the contract.

Therefore, the "Entire Contract" provision describes the documents that "make up the entire contract" and it is clear that the parties did not intend for the prospectus to become part of the contract. Accordingly, the Court finds that the contracts are fully integrated and self-serving parol evidence cannot be used to vary or contradict the terms of the subject policies.[2]

---

[2] This conclusion also forecloses Jackson's argument that the prospectuses are incorporated by reference. Unsigned documents may be incorporated into and become part of a contract if the contract "plainly refers" to the unsigned document. *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010) (orig. proceeding) (per curiam); *Owen v. Hendricks*, 433 S.W.2d 164, 167 (Tex. 1968). Incorporation by reference requires more than merely mentioning the document. *Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 189 (Tex. App.—Dallas 2013, no pet.) (citation omitted). The language in the signed document must show the parties intended for the unsigned document to become part of the agreement. *Id.*; *see also One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 268 (5th Cir. 2011) (citing 11 Williston on Contracts § 30:25 (4th ed. 1999) ("[I]n order to uphold the validity of terms incorporated by reference, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.")).

## B. The Contract is Not Ambiguous as to the Calculation and Application of the Surrender Charge

"In Texas, whether the language of a contract is ambiguous is a question of law for the court." *Hennigan v. Chargers Football Co.*, 431 F.2d 308, 314 (5th Cir. 1970) (citing *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968)). Neither party asserts that the relevant contractual provisions are ambiguous (Dkt. #59 at ¶ 8; Dkt. #70 at ¶ 8). However, "[a] court may conclude that a contract is ambiguous even in the absence of such a pleading by either party." *Sage St. Assocs. v. Northdale Const. Co.*, 863 S.W.2d 438, 445 (Tex. 1993).

"An unambiguous contract must be interpreted by the court as a matter of law." *Id.* (citing *SAS Inst., Inc. v. Breitenfeld,* 167 S.W.3d 840, 841 (Tex. 2005)). If a contract "is worded so that a court can give it a certain or definite legal meaning or interpretation, it is not ambiguous." *Id.* When a contract is unambiguous, extrinsic evidence "will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports.'" *Skyland Developers, Inc. v. Sky Harbor Assocs.,* 586 S.W.2d 564, 568 (Tex. App—Corpus Christi 1979, no writ) (quoting *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 157 (Tex. 1951)). The Court must enforce the unambiguous language in a contract as written, and the applicable standard is the "objective intent" evidenced by the language used, rather than the subjective intent of the parties. *See Sun Oil Co.,* 626 S.W.2d at 731–32.

Contract terms "are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). The Court's primary concern is to enforce the parties' intent as expressed in the contract. *Sundaram*, 2008 WL 80017 at *9. When construing a contract, the intention of the parties is to be gathered from the instrument as a whole. *See Seagull Energy*, 207 S.W.3d at 345; *SAS Inst.*, 167 S.W.3d at 841. The "court is bound to read all parts of a contract

together to ascertain the agreement of the parties." *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex. 1994). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *SAS Inst., Inc.,* 167 S.W.3d at 841.

The Court may not consider extrinsic evidence to contradict or to vary the meaning of unambiguous language in a written contract in order to create an ambiguity. *Sears, Roebuck & Co. v. Commercial Union Ins. Corp.,* 982 S.W.2d 151, 154 (Tex. App.—Houston [1st Dist.] 1998, no pet.). The Court may consider the parties' interpretations of the contract through extrinsic or parol evidence only after a contract is first determined to be ambiguous. *See Friendswood Dev. Co. v. McDade & Co.,* 926 S.W.2d 280, 283 (Tex. 1996). An "ambiguity must become evident when the contract is read in context of the surrounding circumstances, not after parol evidence of intent is admitted to create an ambiguity." *CBI Indus.,* 907 S.W.2d at 521. One of the exceptions to the parol evidence rule is that if the written instrument itself shows to be either ambiguous or incomplete, parol testimony is admissible to show what the real contract was to the extent necessary to remove the ambiguity, and to make the contract complete in its terms which show to be incomplete. *Warren Bros. Co. v. AAA Pipe Cleaning Co.,* 601 S.W.2d 436, 438 (Tex. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.) (quoting *Magnolia Warehouse & Storage Co. v. Davis & Blackwell,* 195 S.W. 184, 185 (1917)). In other words, "[w]here a writing is incomplete or ambiguous, parol evidence is admissible to explain the writing or to assist in the ascertainment of the true intentions of the parties insofar as the parol evidence does not alter or contradict any part of the written memorandum in question." *Warren Bros.,* 601 S.W.2d at 438–39.

If after application of the pertinent rules of construction, the contract is subject to two or more reasonable interpretations, the contract is ambiguous, and a fact issue exists regarding the

parties' intent. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). A lack of clarity in the language chosen by the parties does not suffice to render an agreement ambiguous. *Universal C.I.T. Credit Corp. v. Daniel,* 243 S.W.2d 154, 157 (1951). Rather, "[o]nly if the intention of the parties as expressed on the face of the document is doubtful may the court resort to parol evidence to resolve the doubt." *Massey v. Massey,* 807 S.W.2d 391, 405 (Tex. App.—Houston [1st Dist.] 1991, writ denied). An ambiguity does not arise simply because the parties advance conflicting interpretations of their agreement. *See Forbau,* 876 S.W.2d at 134.

For an ambiguity to exist, both interpretations must be reasonable. *Columbia Gas*, 940 S.W.2d at 589. It is for the Court to decide whether there is more than one reasonable interpretation of a contract, thereby creating a fact issue concerning the parties' intent. *Id*. "If the contract contains an ambiguity, summary judgment is improper 'because the interpretation of the instrument becomes a fact issue.'" *Gilliland v. Cornell Companies, Inc.*, No. CIV.A.H-07-1655, 2008 WL 4858353, at *6 (S.D. Tex. Nov. 10, 2008) (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)).

> The relevant surcharge provision reads:
>
> **At or before the Income Date, the Owner may withdraw all or part of the amounts under this Contract by informing the Company at the Service Center.** For full withdrawal, this Contract, or a completed Lost Contract Affidavit, must be returned to the Service Center.
>
> **Premiums withdrawn from the Contract Value may be subject to Withdrawal Charges and Recapture Charges**. In addition to a Withdrawal Charge and Recapture Charge, a withdrawal from a Fixed Account Option may also incur an Excess Interest Adjustment.
> . . . .
>
> Unless otherwise specified, the withdrawal will be made from each Investment Division and each Fixed Account Option in proportion to their current value.

11

(Dkt. #72, Exhibit P at p. 16 (VA630)) (emphasis added).

> **WITHDRAWAL CHARGE**. A Withdrawal Charge may be imposed upon certain withdrawals and in the event of payments under an income option commencing during the first Contract Year. **Withdrawal Charges will be calculated in accordance with the Withdrawal Charge schedule on the Contract Data Page. The Withdrawal Charge is equal to the Withdrawal Charge percentage applied to the portion of Remaining Premium withdrawn.** The Withdrawal Charge will be taken from the Investment Divisions and the Fixed Account Options in the same proportion as the requested withdrawal.
>
> **The Withdrawal Charge will be deducted from the remaining Contract Value such that the actual reduction in Contract Value as a result of the withdrawal may be greater than the withdrawal amount requested and paid.**
>
> For purposes of determining the Withdrawal Charge, earnings are defined as the excess of the Contract Value over the sum of Remaining Premiums. Withdrawals will be allocated first to earnings, if any (which may be withdrawn free of any Withdrawal Charge), and second to Remaining Premium on a first-in, first-out basis so that all withdrawals will be allocated to Remaining Premium to which the lowest (if any) Withdrawal Charges apply.
>
> **ADDITIONAL FREE WITHDRAWAL.** During a Contract Year, You may make partial withdrawals from the Contract without the Withdrawal Charge and Excess Interest Adjustment being applied. This Additional Free Withdrawal is equal to:
> 1. 10% of Premium that remains subject to Withdrawal Charges and that has not been previously withdrawn (this can be utilized once or in segments throughout the Contract Year); less,
> 2. earnings, as defined in the Withdrawal Charge provision. Any amount to satisfy the minimum required distribution would reduce the amount available under Your Additional Free Withdrawal.
>
> . . . .
>
> Although Additional Free Withdrawals reduce Contract Value in either the Investment Division and/or the Fixed Account Option, they do not reduce Remaining Premium.

(Dkt. #72, Exhibit P at p. 17 (VA630)) (emphasis added).

> The contract further defines "Remaining Premium" as
>
> **REMAINING PREMIUM.** The total Premium reduced by withdrawals that **incur** Withdrawal Charges and withdrawals of Premiums that are no longer subject to Withdrawal Charges.

(Dkt. #72, Exhibit P at p. 6 (VA630)) (emphasis added).

The Court finds that the contract is unambiguous and, in contrast, sets forth a three-step process related to the calculation of surrender charges.

> **Step 1**
> **At or before the Income Date, the Owner may withdraw all or part of the amounts under this Contract by informing the Company at the Service Center.** For full withdrawal, this Contract, or a completed Lost Contract Affidavit, must be returned to the Service Center. **Premiums withdrawn from the Contract Value may be subject to a Withdrawal Charge.**
> . . . .
>
> **Unless otherwise specified, the withdrawal will be made from each Investment Division and each Fixed Account Option in proportion to their current value.**

(Dkt. #72, Exhibit P at p. 16 (VA630)) (emphasis added). Summarizing Step 1, the Owner may withdraw amounts from the contract by informing the Company, "Premiums withdrawn from Contract Value may be subject to a Withdrawal Charge," and those "withdrawal[s] will be made from each Investment Division and each Fixed Account Option in proportion to their current value." (Dkt. #72, Exhibit P at p. 16 (VA630)). The next page of the contract describes the Withdrawal Charge of Step 1 (*See* Dkt. #72, Exhibit P at p. 17 (VA630)).

> **Step 2**
> **WITHDRAWAL CHARGE**. . . . **The Withdrawal Charge is equal to the Withdrawal Charge percentage applied to the portion of Remaining Premium withdrawn.** The Withdrawal Charge will be taken from the Investment Divisions and the Fixed Account Options in the same proportion as the requested withdrawal.

(Dkt. #72, Exhibit P at p. 17 (VA630)) (emphasis added). Summarizing Step 2, the Withdrawal Charge specified in Step 1 "is equal to the Withdrawal Charge percentage applied to the portion of Remaining Premium withdrawn." Providing an implicit order and distinction to Step 1, Step 2 states that this "Withdrawal Charge will be taken from the Investment Divisions and the Fixed Account Options in the same proportion as the requested withdrawal" where in Step 1 "the

withdrawal w[as] made from each Investment Division and each Fixed Account Option in proportion to their current value." (*See* Dkt. #72, Exhibit P at pp. 16–17 (VA630)).

> **Step 3**
> **The Withdrawal Charge will be <u>deducted from the remaining Contract Value</u> such that the actual reduction in Contract Value as a result of the withdrawal may be greater than the withdrawal amount requested and paid**.

(Dkt. #72, Exhibit P at p. 17 (VA630)) (emphasis added). Summarizing Step 3, the calculated Withdrawal Charge is deducted from "the remaining Contract Value" and it is made clear to the reader that the "actual reduction of Contract Value as a result of the withdrawal may be greater than the withdrawal amount requested and paid." (Dkt. #72, Exhibit P at p. 17 (VA630)).

Jackson asserts that the surrender charge is deducted from the Remaining Premium withdrawn (i.e. amount of premium withdrawn). Jackson asserts that a customer can request a "gross" or "net" withdrawal when they fill out the withdrawal form. A "gross" withdrawal is the total amount withdrawn from a customer's account and includes any withdrawal charges. A "net" withdrawal is the check amount received after withdrawal charges are deducted from the gross amount withdrawn. Thus, Jackson asserts it calculates surrender charges based on the gross Remaining Premium withdrawn (or amount of premium withdrawn), which includes the surrender charge, and supports this interpretation with examples illustrated in the prospectus.

However, the contract clearly states that the Withdrawal Charge will be deducted from the "remaining Contract Value" and not the requested withdrawal amount. Furthermore, the terms "gross" and "net" withdrawal are absent from the contract language. Lastly, the calculation Jackson uses to arrive at the specific surrender charge amount is also absent from the contract. Jackson has failed to prove as a matter of law that it properly calculates and applies the surrender

charges pursuant to the unambiguous language of the contracts.[3] Thus, Jackson has failed to prove as a matter of law that it is not in breach of the contracts and summary judgment is therefore denied.

## II. Securities Litigation Uniform Standards Act

Lastly, Jackson argues that Plaintiffs' breach of contract claim is barred by the Securities Litigation Uniform Standards Act ("SLUSA"). The SLUSA states that "[n]o covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging . . . an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security . . . ." 15 U.S.C. § 77p(b)(1). The SLUSA prevents a securities class action from proceeding on the basis of state law if the complaint "*alleg[es]* . . . an untrue statement or omission." 15 U.S.C. § 77p(b)(1) (emphasis added). "The issue of preemption thus hinges on the content of the allegations—not on the label affixed to the cause of action." *Miller v. Nationwide Life Ins. Co.*, 391 F.3d 698, 702 (5th Cir. 2004); *see, e.g.*, *Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 310–11 (6th Cir. 2009) ("Courts . . . must look to . . . the substance of a complaint's allegations in applying SLUSA. . . . It is whether the complaint covers the prohibited theories, no matter what words are used (or disclaimed) in explaining them."); *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 300 (3d Cir. 2005) ("[P]reemption does not turn on whether allegations are characterized as facts or as essential legal elements of a claim, but rather on whether the SLUSA prerequisites are alleged in

---

[3] Jackson's formula to calculate the surrender charge is as follows:

Surrender Charge % x (Amount of premium withdrawn / (1 – Surrender Charge %)).

(Dkt. #59 at 15–17). There is no mention of that calculation in the contract.

15

one form or another. A contrary approach, under which only essential legal elements of a state law claim trigger preemption, is inconsistent with the plain meaning of the statute.").

For example, in *Miller*, the plaintiff purchased annuities from the defendant with the understanding there would be no fees charged. 391 F.3d at 701–02. The plaintiff filed suit claiming violations under the Securities Act of 1933 after realizing he had been charged short-term trading fees contrary to his contract. *Id.* The Fifth Circuit found the claims alleging federal securities law violations to be barred by the statute of limitations, and further dismissed the state law breach of contract claim pursuant to SLUSA. *Id.* The court concluded that, although the plaintiff "styled it [as] a claim for 'breach of contract[,]'" the plaintiff had alleged both untrue statements and omissions of material fact in his state law breach of contract claim. *Id.* at 702.

Jackson asserts that "Plaintiffs' Complaint is replete with allegations that Jackson made untrue statements or omitted material facts in connection with the sale of annuities." (Dkt. #59 at p. 27). However, Jackson's citations to the Amended Complaint take issue with Plaintiffs' negligent misrepresentation claim, which the Court previously dismissed (Dkt. #31).

Furthermore, the Ninth Circuit addressed this very question: "Does SLUSA displace class actions alleging breach of a variable universal life insurance contract?" *Freeman Investments, L.P. v. Pac. Life Ins. Co.*, 704 F.3d 1110, 1113 (9th Cir. 2013). *Freeman* involved a dispute over the meaning of a specific contractual term. *Id*. at 1115. The plaintiffs in *Freeman* contended that a particular term should have been interpreted according to certain industry standards, while defendant argued that the term should have been interpreted based on other language in the insurance policy. *Id*. Thus, in order to "succeed on th[eir] claim, plaintiffs need not show that [defendant] misrepresented the cost of insurance or omitted critical details. They need only persuade the court that theirs is the better reading of [a] contract term." *Id.*

16

Similar to *Freeman*, Plaintiffs' breach of contract claim's essence is the proper interpretation of Jackson's contracts and the way Jackson calculates its surrender charges. Specifically, Plaintiffs claim that

> Jackson is assessing excess charges as a matter of uniform application of its methodology and breaching the terms of its contract as to all contract holders who incur such charges.
> . . .
>
> Common questions of law and fact predominate over any individual questions affecting Class members, including, but not limited to, the specific and uniform way in which Defendant has imposed Surrender Charges.
> . . .
>
> Jackson's assessment of surrender charges was done consistently and uniformly in a manner contrary to the terms and conditions of the applicable contracts.

(Dkt. #90 at ¶¶ 30, 71, 82).

"[W]hile a contract dispute commonly involves a 'disputed truth' about the proper interpretation of the terms of a contract, that does not mean one party omitted a material fact by failing to anticipate, discover and disabuse the other of its contrary interpretation of a term in the contract." *Freeman*, 704 F.3d at 1115–16 (quoting *Webster v. N.Y. Life Ins. & Annuity Corp.,* 386 F. Supp. 2d 438, 441 (S.D.N.Y.2005)). As such, the Court finds Plaintiffs' breach of contract claim is not barred by the SLUSA.

## CONCLUSION

It is therefore **ORDERED** that Defendant Jackson National Life Insurance Company's Motion for Summary Judgment (Dkt. #59) is hereby **DENIED** with regard to Plaintiffs' breach of contract claim and **GRANTED** with regard to Plaintiffs' breach of fiduciary duty claim.

**SIGNED this 8th day of August, 2018.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE